Alexander Nemiroff, Esquire
**GORDON REES SCULLY
MANSUKHANI, LLP**
Three Logan Square
1717 Arch Street, Suite 610
Philadelphia, Pennsylvania 19103
(267) 602-2040
anemiroff@grsm.com

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| COTIVITI, INC., COTIVITI HOLDINGS, INC. and COTIVITI USA, LLC<br><br>Plaintiffs,<br><br>v.<br><br>KEVIN MCDONALD, RONALD JONES, JR., and JEFFREY MARTIN<br><br>Defendants. | Civil Action No.<br><br><br>**COMPLAINT** |

Plaintiffs Cotiviti, Inc., and its subsidiaries Cotiviti Holdings, Inc. and Cotiviti USA, LLC (together, the "Plaintiffs" or "Cotiviti"), by and through their undersigned attorneys, Gordon Rees Scully Mansukhani, LLP ("Gordon & Rees") bring the following Complaint against defendants Kevin McDonald ("McDonald"), Ronald Jones, Jr. ("Jones"), and Jeffrey Martin ("Martin") (together, the "Defendants"), and allege as follows:

## NATURE OF THE ACTION

1.      This is a case involving Defendants' breaches of several agreements with Cotiviti and its predecessors as well as their misappropriation of trade secrets.

2.      Cotiviti is a leading provider of analytics-driven payment accuracy and spend management solutions.

3.      As of December 31, 2018, Cotiviti had approximately 5,300 employees – 4,300 employees in the United States and 1,000 international employees.

4.      Cotiviti does business throughout the United States, including but not limited to New York, Delaware, Connecticut, Massachusetts, Utah, Georgia, Pennsylvania, Texas and Kentucky.  It also has operations in Canada and India.

5.      Defendants held senior leadership positions with Cotiviti and its predecessor companies.

6.      Cotiviti recently learned that McDonald, a former Vice-President, Client Engagement, has accepted employment with Discovery Health Partners ("DHP"), a direct competitor, as a member of its executive leadership team in violation of his restrictive covenant agreements with Cotiviti.

7.      Jones and Martin are also former directors of Cotiviti who resigned and have accepted employment with DHP in violation of their restrictive covenant agreements with Cotiviti.

8.      With this action, Plaintiffs seek preliminary injunctive relief and compensatory damages against Defendants arising from their contractual and/or common law violations, and other misconduct including but not limited to, breaches of their agreements with Plaintiffs, and unfair competition.

## PARTIES

9.      Plaintiff Cotiviti, Inc. is a Delaware corporation with its principal place of business located in Atlanta, Georgia.

10.      Plaintiff Cotiviti Holdings, Inc. is a Delaware corporation with its principal place of business located in Atlanta, Georgia.

11.      Plaintiff Cotiviti USA, LLC is a Delaware limited liability company wholly owned by Cotiviti Holdings, Inc.  Accordingly, for diversity purposes, Cotiviti USA, LLC is considered a citizen of the states of Delaware and Georgia.

12.      Cotiviti Holdings, Inc. is wholly owned by Cotiviti, Inc. Accordingly, Cotiviti, Inc. is the parent company to, and wholly owns Plaintiffs Cotiviti Holdings, Inc. and Cotiviti USA, LLC.

13.      Defendant McDonald is a citizen of the State of Texas and resides at 14110 Valley Creek Drive, Dallas, Texas 75254.

14.      Defendant Jones is a citizen of the State of Kentucky and resides at 4604 Doe Spring Court, Louisville, Kentucky 40241.

15.      Defendant Martin is a citizen of the State of Florida and resides at 1253 Montgomery Bell Road, Wesley Chapel, Florida 33543.

## JURISDICTION AND VENUE

16.      This Court has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds seventy-five thousand dollars ($75,000.00) and Plaintiffs are diverse from Defendants as they are citizens of different states.

17.      The damages Defendants can and will cause Cotiviti by violating their non-compete agreements far exceed the jurisdictional threshold of $75,000.00.

18.     During his final quarter of employment with Cotiviti, McDonald's revenue targets for his business unit were in excess of $108 million, Jones' revenue targets for his business unit were in excess of $14 million and Martin's revenue targets for his business unit were in excess of $79 million.  The parties' agreements also call for Cotiviti's recovery of reasonable legal fees in connection with this litigation which will exceed $75,000.00.

19.     Venue in this District is proper because the parties consented to this venue based upon forum selection clauses contained in the parties' Agreements.

20.     Jurisdiction is appropriate over Plaintiffs' state law claims under 28 U.S.C. § 1367.

## FACTS

21.     Cotiviti is a leading provider of analytics-driven solutions serving healthcare payers, focusing on payment accuracy, risk management, and quality outcomes.  Cotiviti works with over one hundred eight healthcare organizations, including a majority of the twenty-five largest United States health care plans as well as the Centers for Medicare and Medicaid Services.

22.     Cotiviti is also a leading provider of payment accuracy solutions to retail clients, including 30 of the top 50 retailers in North America.

23.     As health care reimbursements are shifting toward quality of services, procedure outcomes, readmissions, and patient satisfaction, Cotiviti assists health care providers and payers, using its exclusive trade secrets, in measuring the quality and cost of service as well as the patient experience.

24.     Cotiviti leverages its robust technology platform, configurable analytics, proprietary information assets and expertise in healthcare reimbursement to assist its clients enhance their claims payment accuracy and health care value-based reimbursements.  In doing

so, its exclusive trade secrets and algorithms assess, among other things, if a health care provider performed any unnecessary services that lead to low-value care, waste, and unneeded payments.

25.     As physician compensation shifts from fee-for-service towards value-based services and reimbursements, Cotiviti offers its unique services to health care systems, physician practice groups, and post-acute care centers, to develop curated networks, to compensate quality care and to recruit top doctors.

26.     DHP is a direct competitor of Cotiviti in the field of analytics-driven payment accuracy and spend management solutions for the healthcare sector.

27.     McDonald began his employment with Cotiviti in May 2016 as its Vice-President, Client Engagement.

28.     As the Vice-President, Client Engagement, McDonald was a senior leader responsible for strengthening client relationships to support key strategic growth initiatives.

29.     Martin begin his employment with a predecessor of Cotiviti in August 2011 as an auditor.  Thereafter, he was an Audit Manager from November 2013 through June 2015.  In or about June 2015, Martin became Cotiviti's Director of Audit Operations based in Conshohocken, Pennsylvania.

30.     As the Director of Audit Operations, Martin was responsible for providing leadership and management for one or more accounts or significant audit projects.  This position oversees all audit activities for assigned accounts to maximize valid claim identification and overpayment recoveries.

31.     Jones began his employment with a predecessor of Cotiviti in May 2005 as an auditor.  Thereafter, he was a Senior Team Lead from March 2012 through January 2013 and a Manager, Operations in 2014.

32.     Jones became a Manager, Payment Accuracy/Data Mining for Cotiviti in January 2014.  In or about May 2016, Jones became Cotiviti's Director, Operations – Data Mining, Analytics and Payment Accuracy.

33.     As a Director, Operations – Data Mining, Analytics and Payment Accuracy, Jones was responsible for providing leadership and management of Cotiviti accounts, including responsibility for development of new audit concepts, refining older concepts, client contract management, audit staffing, oversight over a team of managers, senior auditors, junior auditors, and staff, staff training and development, overall audit service delivery to major clients, audit productivity, and account growth.

34.     Cotiviti's client information and trade secrets, including its audit concepts, are not generally known to its competitors such as DHP.  Cotiviti's audit concepts are trade secrets. These audit concepts are developed through the utilization of research and development teams which scour provider contracts, policies, and regulations to develop opportunities for its clients not to issue overpayments.  Cotiviti has developed these audit concepts over many years and reflects thousands of hours of work and the expenditure of substantial financial resources invested in generating and assisting its clients.  If other companies such as DHP could lawfully obtain access to its audit concepts, client data and information, they would pay millions of dollars for the right to do so and the damage to Cotiviti's business and operations would be irreparable.

35.     In fact, Jones has stated previously under oath that "if a competitor were able to use Cotiviti's audit concepts and algorithms to create its software, it would be able to identify claims as having been overpaid that the competitor's own software was not originally able to recognize.  In this way, a competitor unfairly competes and directly harms Cotiviti's ability to

identify overpayments and generate revenue by identifying those claims using Cotiviti's proprietary concepts developed through Cotiviti's research and development." *See* Declaration of Ronald Jones attached hereto as Exhibit **"A"** at ¶ 18.

36.     Additionally, Jones has previously stated under oath "the audit concepts, algorithms, and tools are not publicly available and Cotiviti has implemented protections to prevent unauthorized access.  Only select employees have access to the concept library, algorithms, tools, training materials, and software used by Cotiviti.  Cotiviti has implemented controls to block employees from sending emails with attachments to well-known webmail accounts.  It also blocks connecting removable media to workstations and copying data.  Cotiviti further engages in web filtering to block well-known sites that all for data exfiltration." *See* Ex. **"A,"** Jones Decl. at ¶ 25.

37.     While the audit concepts may be developed from a combination of proprietary and public sources, the overall concepts are secrets. These audit concepts stem from unique integration, compilation, research, and cultivation.  The audit processes and concepts allow Cotiviti to save their clients billions of dollars.  They are the intellectual property of Cotiviti and the foundation of everything Cotiviti does.

38.     Defendants were also charged with significant trust and responsibility to serve as the primary and direct contacts of Cotiviti with major clients.  Collectively, they were responsible for all aspects of audit projects, directly communicating with clients, handling client needs and addressing their concerns, supervising managers, senior, and junior auditors who either developed or executed Cotiviti's audit concepts.  Defendants were privy to sensitive business strategies and plans, such as plans for growth, marketing strategies, plans to differentiate itself from its competitors such as DHP, and generally all of the information

available to trusted members of Cotiviti's management team. Defendants also had access to staffing data including pay and benefit structures, all of Cotiviti's audit concepts which are trade secrets and the core of Cotiviti's business, and other critical personnel and business information relating to the employment of these individuals.

### The Agreements

39.     At the inception of his employment, McDonald executed a Non-Disclosure, Non-Solicitation, and Non-Compete Agreement dated May 18, 2016 (the "Non-Compete Agreement") in which he agreed not to compete with Cotiviti and/or solicit Cotiviti's employees (including Jones) for a period of two (2) years from the date of his separation from Cotiviti.

40.     McDonald electronically accepted the Non-Compete Agreement on May 18, 2016. A copy of the Non-Compete Agreement is attached hereto as Exhibit **"B."**

41.     In section 4 of the Non-Compete Agreement, McDonald agreed to the following:

**Non-Solicitation of Employees**.   You agree that during the term of your employment by Cotiviti and for a period of two (2) years thereafter, you will not directly or indirectly (i) solicit any person who is at the time of the solicitation, or was, at any time during the two (2) year period ending on the date on which your employment by Cotiviti ends (or shorter period, if applicable), (ii) an employee, agent, or independent contractor of Cotiviti, (iii) with whom you had business contact in the course of your employment by Cotiviti, (iv) for the purpose of offering employment to such person within the Territory with an individual or entity which is engaged in providing or selling Competitive Services, (v) for the purpose of providing any services which are substantially similar to the services performed by such person for Cotiviti.

Ex. **"B"** at ¶ 4.

42.     In section 5 of the Non-Compete Agreement, McDonald agreed to the following:

**Non-Compete**.  You agree that during the term of your employment by Cotiviti and for a period of two (2) years thereafter, regardless of the reason for such separation, you will not directly or indirectly provide substantially similar professional services within the Territory to that part of any Person engaged in selling or providing Competitive Services.

Ex. **"B"** at ¶ 5.

43.     "Competitive Services" is defined in Section 3 of the Non-Compete Agreement as follows:

> [A]ny services or products that are substantially similar to or competitive with any of the services or products provided by the Company as of the date of . . . the termination of your employment . . . . ("Competitive Services").

44.     "Person" is defined in Section 3 of the Non-Compete Agreement as follows:

> "Person" means any individual, sole proprietorship, partnership, corporation, limited liability company, joint venture, joint stock company, trust, or other entity.

45.     Cotiviti offered Defendants Restricted Stock Unit Award Agreements which were electronically accepted by Defendants (collectively the "RSU Agreements").  A copy of the RSU Agreements, including Exhibits A thereto are attached hereto as Exhibit **"C."**

46.     More specifically, Cotiviti offered McDonald the option to participate in the Cotiviti Holdings, Inc. 2016 Equity Incentive Plan.  McDonald agreed to participate in said plan.  Specifically, McDonald entered into RSU Agreements effective on May 25, 2016, and again on February 1, 2017, and again on February 1, 2018 in which Cotiviti granted McDonald restricted stock units.  The collective value of the restricted stock at the times it was granted to McDonald in 2016 through 2018 was over $80,000.  In consideration thereof, his continued director-level position with Cotiviti, and his access to Cotiviti's confidential information and trade secrets, the agreements include covenants not to compete and not to solicit any of Cotiviti's clients or employees for a period of two (2) years after separation from employment.

47.     Cotiviti also offered Jones the option to participate in the Cotiviti Holdings, Inc. 2016 Equity Incentive Plan.  Jones agreed to participate in said plan.  Specifically, Jones entered into an RSU Agreement effective on February 1, 2017, in which Cotiviti granted Jones restricted

stock units.  The collective value of the restricted stock at the times it was granted to Jones in 2017 was over $5,000.  In consideration thereof, his continued director-level position with Cotiviti, and his access to Cotiviti's confidential information and trade secrets, the agreement included a covenant not to compete and not to solicit any of Cotiviti's clients or employees for a period of two (2) years after separation from employment.

48.     Cotiviti also offered Martin the option to participate in the Cotiviti Holdings, Inc. 2016 Equity Incentive Plan.  Martin agreed to participate in said plan.  Specifically, Martin entered into RSU Agreements effective on February 1, 2017, and again on February 1, 2018, in which Cotiviti granted Martin restricted stock units.  The collective value of the restricted stock at the times it was granted to Martin in 2017 through 2018 was over $39,000.  In consideration thereof, his continued director-level position with Cotiviti, and his access to Cotiviti's confidential information and trade secrets, the agreements include covenants not to compete and not to solicit any of Cotiviti's clients or employees for a period of two (2) years after separation from employment.

49.     To further protect Cotiviti's trade secrets, confidential and other proprietary information, and in consideration for access to such information and Defendants' participation in the equity incentive plan, Exhibit A of the RSU Agreements contain express non-compete and non-solicitation covenants governing the protection and treatment of Cotiviti's confidential information.  Specifically, section 4 of the RSU Agreements state identically as follows:

> Non-Compete.  Participant agrees that during the term of Participant's Service with the Company or its Subsidiaries and for a period of two (2) years thereafter, regardless of the reason for such separation, Participant will not directly or indirectly provide substantially similar professional services within the Territory to that part of any Person engaged in selling or providing Competitive Services.

50.     "Competitive Services" is defined identically in Section 2 of the RSU Agreements as follows:

> [A]ny services or products that are substantially similar to or competitive with any of the services or products provided by the Company as of the date of . . . the termination or expiration of Participant's Service with the Company or its Subsidiaries whichever is earlier ("Competitive Services").

51.     "Person" is defined identically in Section 2 of the RSU Agreements as follows:

> "Person" means any individual, sole proprietorship, partnership, corporation, limited liability company, joint venture, joint stock company, trust, or other entity.

52.     Defendants agreed in Section 6 of Exhibit A of the RSU Agreements and McDonald in Section 7 of the Non-Compete Agreement that in the event of a breach of the agreements Plaintiffs would be entitled to immediate injunctive relief in addition to damages. The parties further stipulated and agreed to the exclusive jurisdiction of the federal or state courts within the State of New York for any action brought under or in connection with the Agreements.  The agreements are all governed by Connecticut law.

53.     Despite these express contractual and legal obligations, Defendants have accepted employment with DHP, a direct competitor of Cotiviti.

**Defendants' Resignations**

54.     Defendants have ignored and violated their obligations to Cotiviti as set forth in their Agreements. Specifically, McDonald provided written notice on January 24, 2019 that he was resigning effective February 8, 2019 and did not disclose that he would be working for DHP (in the same geographic location as he worked for Cotiviti).  Cotiviti allowed McDonald to work through a two week notice period with continued access to Cotiviti's trade secrets and most sensitive information, as well as access to its employees and clients.

55.     Jones provided written notice on April 17, 2019 that he was resigning on May 1, 2019 and did not disclose that he would be working for DHP.  Cotiviti allowed Jones to work through a two week notice period with continued access to Cotiviti's trade secrets and most sensitive information, as well as access to its employees and clients.   Cotiviti thereafter learned Defendants took positions with DHP, a direct competitor.

56.     After learning Defendants joined DHP, Cotiviti advised Defendants McDonald and Jones by letters dated May 20, 2019 and Martin by letter dated May 30, 2019, that they had violated their agreements by taking positions with DHP.

57.     Cotiviti requested written assurance by May 24, 2019 that Defendants McDonald and Jones would not work for a competitor and that they had returned all documents or electronic data relating to Cotiviti.  Copies of the May 20, 2019 letters are attached hereto as Exhibit **"D."**

58.     Defendants McDonald and Jones sought an extension of time to respond to the letters on May 23, 2019, which Cotiviti granted through May 29, 2019.

59.     On May 29, 2019, Defendants McDonald and Jones refused to cease working for DHP in violation of their agreement.

60.     On June 4, 2019, Defendant Martin refused to cease working for DHP in violation of his agreement.

61.     In addition to the breach of their agreements, it would be extremely difficult, if not impossible, for Defendants to perform any duties for DHP without making use of the confidential, proprietary and trade secret information to which they were exposed and which they personally helped develop and execute as executives at Cotiviti.

62.     Defendants held important positions and worked closely with senior management and it would therefore be impossible for them to undertake employment with a direct competitor without making use of that confidential, trade secret, and proprietary information.

63.     The harm that Cotiviti would suffer if Defendants were permitted to continue their employment at DHP and make use of Cotiviti's confidential, trade secret, and proprietary information would be truly irreparable.  The value of that confidential, trade secret, proprietary information simply cannot be stated in dollars and it cannot be easily duplicated.

## COUNT ONE
### (Breach of Contract)

64.     Plaintiffs incorporate the above allegations as if fully set forth herein.

65.     By virtue of the foregoing conduct, Defendants have violated the Non-Compete Agreement and/or RSU Agreements.

66.     Pursuant to the Non-Compete and RSU Agreements, Defendants agreed they would not solicit the clients or employees of Cotiviti or engage in a competing business as defined therein for a period of two years after separation of employment.

67.     Plaintiffs provided consideration for and fully performed their obligations under the Non-Compete and RSU Agreements by, *inter alia*, employment of Defendants, providing Defendants with access to Plaintiffs' confidential and trade secret information, allowing Defendants to participate in Plaintiffs' equity incentive plan, and enabling Defendants to use Plaintiffs' goodwill up until their resignations from employment.

68.     The Non-Compete and RSU Agreements are valid and enforceable under Connecticut, Delaware and New York law.

69.     The restrictive covenants contained in the Non-Compete and RSU Agreements are necessary and tailored to protect Plaintiffs' legitimate business interests, including but not

limited to goodwill, clients, and confidential and proprietary business information.  The Non-Compete and RSU Agreements are reasonably limited to the United States, in light of the fact that Cotiviti is an international company with operations throughout the world.

70.    Defendants breached their obligations under the Non-Compete and RSU Agreements after resigning from Plaintiffs by engaging in a business in direct competition with Plaintiffs, offering products and services in direct competition with Plaintiffs, soliciting Plaintiffs' employees, diverting business away from Cotiviti for DHP's benefit, and using Cotiviti's confidential and trade secret information to compete unfairly, including information relating to Cotiviti's clients, pricing, marketing, audit concepts, and other data.

71.    Upon information and belief, Defendants' breaches of these covenants continue to this day, and will continue unless and until they are ordered to abide by the obligations to which they agreed when they electronically accepted the Non-Compete and RSU Agreements.

72.    As a direct result of Defendants' breaches, Cotiviti is suffering and will continue to suffer irreparable injury, including loss of business expectancies, profits, employees, clients, confidential information, and damage to goodwill, for which a remedy at law is inadequate – as Defendants expressly acknowledged in the Non-Compete and RSU Agreements and as Jones has previously declared under oath.  Accordingly, Plaintiffs are entitled to injunctive and equitable relief.

73.    In addition, as a consequence of Defendants' breaches of the Non-Compete and RSU Agreements, Plaintiffs seek actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

## COUNT TWO
### (Misappropriation of Trade Secrets – 18 U.S.C. § 1832)

74.     Plaintiffs incorporate the above allegations as if fully set forth herein.

75.     By virtue of their employment with Cotiviti and their performance of responsibilities for Cotiviti, Cotiviti provided Defendants access to and Defendants possessed trade secrets and confidential information of Cotiviti, including *inter alia*, access to confidential client information relating to Cotiviti's pricing, proprietary procedures, audit concepts, training, and intellectual property, among other information.

76.     Cotiviti's trade secrets, including its audit concepts are not generally known to its competitors such as DHP. Cotiviti's audit concepts are developed through utilization of research and development teams which scour provider contracts, policies, and regulations to develop opportunities for its clients not to issue overpayments. These concepts have been developed by Cotiviti over many years and reflect thousands of hours of work and the expenditure of substantial financial resources invested in generating and assisting its clients.  If other companies such as DHP could lawfully obtain access to its audit concepts, client data and proprietary tools and information, they would pay millions of dollars for the right to do so and the damage to Cotiviti's business and operations would be irreparable.

77.     While the audit concepts may be developed from a combination of proprietary and public sources, the overall concepts are secrets. As Jones has previously declared under oath, these audit concepts stem from unique integration, compilation, research, and cultivation. Defendants were directly involved in the development and execution of Cotiviti's audit concepts.

78.     Cotiviti developed and maintained such information at great time, cost and expense to Cotiviti; such information is maintained on password protected networks accessible only be certain Cotiviti employees with need to use such information on Cotiviti's behalf.

79.     In addition, clients entrust Cotiviti with their highly confidential information, to which Defendants had substantial access to Cotiviti's highly confidential information.

80.     Cotiviti derives independent economic value from the trade secrets entrusted to Defendants; such information is not generally known or readily ascertainable by proper means by other individuals who can obtain economic value from its disclosure and use, and the information is the subject of significant efforts to maintain its secrecy.

81.     Such information is considered a trade secret under the Federal Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1832 *et seq*., because Cotiviti derives independent economic value from this information not generally known to the public, the information is not readily ascertainable by proper means by persons who could obtain economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy. 18 U.S.C. § 1839.

82.     Defendants knew, or should have known that the information, as described: (1) is confidential; (2) was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (3) was developed or acquired by Cotiviti at great expense and effort; (4) was maintained as confidential and is not generally available to the public and Cotiviti's competitors such as DHP; (5) would provide significant benefit to DHP; and (6) is critical to Cotiviti's ability to conduct its business successfully.

83.     Defendants will inevitably misappropriate Cotiviti's trade secrets and confidential information without Cotiviti's consent.  Defendants cannot help but utilize in their new capacity with a competitor the audit concepts, particular client needs, and Cotiviti employee information. Even if Defendants agreed not to disclose any of this information, such agreement would be

ineffective because the trade secrets acquired by Defendants during their employment are the exact information they need to effectively perform for DHP.

84.     Defendants will be, or have been, unjustly enriched by the misappropriation of Cotiviti's trade secrets and confidential information, and, unless restrained, will continue to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate Cotiviti's trade secrets and confidential information.

85.     Defendants' actual and/or threatened misappropriation has been willful and malicious.

86.     As a result of the actual and/or threatened misappropriation of Cotiviti's trade secrets and confidential information, Plaintiffs have lost of business expectancies, trade secrets, and goodwill in amounts which may be impossible to determine, unless Defendants are enjoined and restrained by order of the Court.

87.     In addition, Plaintiffs seek actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

## COUNT THREE
### (Misappropriation of Trade Secrets)

88.     Plaintiffs incorporate the above allegations as if fully set forth herein.

89.     By virtue of their employment with Cotiviti and their performance of responsibilities for Cotiviti, Cotiviti provided Defendants access to and Defendants possessed trade secrets and confidential information of Cotiviti, including *inter alia*, access to confidential client information relating to Cotiviti's pricing, proprietary procedures, audit concepts, training, and intellectual property, among other information.

90.     Cotiviti's trade secrets, including its audit concepts are not generally known to its competitors such as DHP. Cotiviti's audit concepts are developed through utilization of research and development teams which scour provider contracts, policies, and regulations to develop opportunities for its clients not to issue overpayments. These concepts have been developed by Cotiviti over many years and reflect thousands of hours of work and the expenditure of substantial financial resources invested in generating and assisting its clients.  If other companies such as DHP could lawfully obtain access to its audit concepts, client data and proprietary tools and information, they would pay millions of dollars for the right to do so and the damage to Cotiviti's business and operations would be irreparable.

91.     While the audit concepts may be developed from a combination of proprietary and public sources, the overall concepts are secrets. As Jones has previously declared under oath, these audit concepts stem from unique integration, compilation, research, and cultivation. Defendants were directly involved in the development and execution of Cotiviti's audit concepts.

92.     Cotiviti developed and maintained such information at great time, cost and expense to Cotiviti; such information is maintained on password protected networks accessible only be certain Cotiviti employees with need to use such information on Cotiviti's behalf.

93.     In addition, clients entrust Cotiviti with their highly confidential information, to which Defendants had substantial access to Cotiviti's highly confidential information.

94.     Cotiviti derives independent economic value from the trade secrets entrusted to Defendants; such information is not generally known or readily ascertainable by proper means by other individuals who can obtain economic value from its disclosure and use, and the information is the subject of significant efforts to maintain its secrecy.

95.     Such information is considered a trade secret under applicable law because Cotiviti derives independent economic value from this information not generally known to the public, the information is not readily ascertainable by proper means by persons who could obtain economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy.

96.     Defendants knew, or should have known that the information, as described: (1) is confidential; (2) was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (3) was developed or acquired by Cotiviti at great expense and effort; (4) was maintained as confidential and is not generally available to the public and Cotiviti's competitors such as DHP; (5) would provide significant benefit to DHP; and (6) is critical to Cotiviti's ability to conduct its business successfully.

97.     Defendants will inevitably misappropriate Cotiviti's trade secrets and confidential information without Cotiviti's consent.  Defendants cannot help but utilize in their new capacity with a competitor the audit concepts, particular client needs, and Cotiviti employee information. Even if Defendants agreed not to disclose any of this information, such agreement would be ineffective because the trade secrets acquired by Defendants during their employment are the exact information they need to effectively perform for DHP.

98.     Defendants will be, or have been, unjustly enriched by the misappropriation of Cotiviti's trade secrets and confidential information, and, unless restrained, will continue to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate Cotiviti's trade secrets and confidential information.

99.     Defendants' actual and/or threatened misappropriation has been willful and malicious.

100.    As a result of the actual and/or threatened misappropriation of Cotiviti's trade secrets and confidential information, Plaintiffs have lost of business expectancies, trade secrets, and goodwill in amounts which may be impossible to determine, unless Defendants are enjoined and restrained by order of the Court.

101.    In addition, Plaintiffs seek actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

<u>**COUNT FOUR**</u>
<u>**(Unfair Competition)**</u>

102.    Plaintiffs incorporate the above allegations as if fully set forth herein.

103.    By virtue of Defendants' employment with Cotiviti and performance of Defendants' responsibilities, Cotiviti provided Defendants with access to and possession of trade secrets of Cotiviti, as set forth above.

104.    Defendants undertook the foregoing acts of misconduct by resigning and working for a competitor, by refusing to communicate this fact to Cotiviti, and by misappropriating Cotiviti's trade secrets for their own self-interests to gain an unfair competitive advantage in competing with Cotiviti.  Upon information and belief, McDonald assisted DHP in soliciting Jones from Cotiviti's Louisville, Kentucky office.  Defendants are competing with Cotiviti in violation of their respective restrictive covenant agreements. They also each bring unique knowledge of Cotiviti's trade secrets including its audit concepts, software, and customers. Accordingly, Defendants are affecting the marketplace, by orchestrating and interfering with Cotiviti's legitimate business expectancies.

105.    As a consequence of Defendants' unfair competition, Plaintiffs have been injured and face irreparable injury.  Plaintiffs are threatened with the loss of business expectancies,

losing clients, losing employees which have restrictive covenants, further misuse of their confidential information and trade secrets, and loss of goodwill in amounts which are impossible to determine, unless Defendants are enjoined and restrained by order of this court.

106.   In addition, Plaintiffs seek actual, incidental, compensatory, punitive, and consequential damages, along with its reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, by virtue of the acts and conduct complained above, Cotiviti demands judgment in its favor and against Defendants for preliminary and permanent injunctive relief and damages in connection with the above and respectfully requests:

1.   A preliminary injunction enjoining Defendants, directly or indirectly, and whether alone or in concert with others, including any officer, agent, employee and/or representative of DHP, from:

a. using, disclosing, or transmitting for any purpose, including the solicitation or conducting of business or initiation of any contact with Cotiviti's clients, the information contained in the records of Cotiviti, or other information pertaining to Cotiviti's clients, including, but not limited to, the names, addresses, email addresses, personal data, and financial information of the clients;

b. being employed by and/or working with DHP in any capacity;

c. destroying, erasing, or otherwise making unavailable for further proceedings in this matter, any records or documents (including data or information maintained in computer files or other electronic storage media) in Defendants' possession, custody, or control which were obtained from, or which contain information

derived from, any Cotiviti records, which pertain to Cotiviti's clients, or which relate to any of the events alleged in the Complaint in this action.

2.        Defendants, and anyone acting in concert or participation with them, including counsel, and any agent, employee, officer, or representative of DHP, are further ordered to return to Cotiviti's counsel any and all Cotiviti records or information, whether in original, computerized, handwritten, or any other form, and not retain any copies;

3.        Actual, incidental, compensatory, and consequential damages in an amount to be proven at trial;

4.        Punitive damages in an amount to be proven at trial due to Defendants' willful and malicious conduct;

5.        Costs and expenses incurred herein, including reasonable attorneys' fees and interest; and

6.        Any other relief the Court deems appropriate and proper.

Respectfully submitted,

**GORDON REES SCULLY
MANSUKHANI, LLP**

By:    s/ Alexander Nemiroff
       ALEXANDER NEMIROFF
       Three Logan Square
       1717 Arch Street, Suite 610
       Philadelphia, Pennsylvania 19103
       T: (267) 602-2040
       F: (215) 253-5107
       anemiroff@grsm.com

       Attorneys for Plaintiffs

Dated:  July 15, 2019

1186809/45609290v.1

22