UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
:
COTIVITI, INC., COTIVITI HOLDINGS, :
INC., and COTIVITI USA, LLC, :
:
          Plaintiffs, :  19-cv-6559 (VSB)
    - against - :
:  **OPINION & ORDER**
KEVIN MCDONALD, RONALD JONES, :
JR., and JEFFREY MARTIN, :
:
          Defendants :
:
---------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/2/2021

Appearances:

A Michael Weber
Littler Mendelson, P.C.
New York, NY
*Counsel for Plaintiffs*

Daniella Adler
Littler Mendelson, P.C.
New York, NY
*Counsel for Plaintiffs*

Miguel Angel Lopez
Littler Mendelson, P.C.
New York, NY
*Counsel for Plaintiffs*

Miguel Angel Lopez
Littler Mendelson, P.C.
New York, NY
Counsel for Plaintiffs

Alex C. Weinstein
Vedder, Price, P.C.
Chicago, Illinois
*Counsel for Defendants*

Daniel Colin Green
Vedder, Price, P.C.
Chicago, Illinois
*Counsel for Defendants*

Thomas R. Dee
Vedder, Price, P.C.
Chicago, Illinois
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

Before me is Defendants' motion to dismiss Plaintiffs' First Amended Complaint, which asserts claims of breach of contract, misappropriation of trade secrets, and unfair competition. For the reasons stated herein, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

## I. Factual Background[1]

Plaintiffs Cotiviti, Inc., Cotiviti Holdings, Inc., and Cotiviti USA, LLC ("Cotiviti") together make up an analytics company that provides, among other things, payment accuracy and risk management solutions to healthcare payers. (FAC ¶¶ 25–26.) Defendant Kevin McDonald ("McDonald") joined Cotiviti in May 2016 as the Vice President, Client Engagement. (*Id*. ¶ 32.) In this capacity, McDonald was responsible for strengthening relationships with clients to support Cotiviti's strategic growth initiatives. (*Id*. ¶¶ 33–34.) Defendant Jeffrey Martin ("Martin") began his employment with a predecessor of Cotiviti in 2011. He became Cotiviti's Director of Audit Operations in June 2015. (*Id*. ¶ 36.) Martin "was responsible for providing leadership and management for one or more accounts or significant audit projects," and

---

[1] This factual background is derived from the allegations in Plaintiff's First Amended Complaint ("FAC") filed on October 15, 2019. (Doc. 31.) I assume the allegations set forth in the First Amended Complaint to be true for purposes of this motion. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). However, my references to these allegations should not be construed as a finding as to their veracity, and I make no such findings in this Opinion & Order.

"over[saw] all audit activities for assigned accounts to maximize valid claim identification and overpayment recoveries." (*Id*. ¶ 37.) Defendant Ronald Jones, Jr. ("Jones") began his employment with a predecessor of Cotiviti in 2005. He became a Manager, Payment Accuracy/Data Mining for Cotiviti in January 2014, and the Director, Operations – Data Mining Analytics and Payment Accuracy in May 2016. (*Id*. ¶¶ 39–40.) As the Director, Operations – Data Mining Analytics and Payment Accuracy, "Jones was responsible for providing leadership and management of Cotiviti accounts, including responsibility for development of new audit concepts, refining older concepts, client contract management, audit staffing, oversight over a team of managers, senior auditors, junior auditors, and staff, staff training and development, overall audit service delivery to major clients, audit productivity, and account growth." (*Id*. ¶ 41.) Each Defendant interacted with Cotiviti clients and had access to sensitive business information. (*Id*. ¶¶ 35, 38, 43–44, 46.)

Each Defendant signed a number of agreements at the outset and during the course of their employment with Cotiviti. At the beginning of his employment, McDonald signed a Non-Disclosure, Non-Solicitation, and Non-Compete Agreement ("Non-Disclosure Agreement") that prohibited him from competing with Cotiviti or soliciting their employees for a period of two years after his employment terminated. (*Id*. ¶ 47.) Cotiviti offered McDonald the option to participate in Cotiviti Holdings, Inc. 2016 Equity Incentive Plan ("Plan"). In connection with his participation in the Plan, McDonald entered into three Restrictive Stock Unit Awards Agreements ("RSU Agreements")—the first on May 25, 2016, the second on February 1, 2017, and the third on February 1, 2018. Those agreements also contained restrictive covenants attached as Exhibit A. (*Id*. ¶¶ 53–54.) Jones and Martin also entered into RSU Agreements containing restrictive covenants that prohibited them from joining competitors or soliciting

3

clients for two years after the termination of their employment. (*Id.* ¶¶ 55–56.)

McDonald resigned from Cotiviti effective February 8, 2019. (*Id.* ¶ 63.) In March 2019, McDonald accepted a position as Vice President of Eligibility Operations at Discovery Health Partners ("DHP"), a direct competitor of Cotiviti. (*Id.* ¶¶ 7, 31.) Jones resigned from Cotiviti on May 1, 2019, and subsequently accepted employment with DHP as a Senior Director, Coordination of Benefits. (*Id.* ¶¶ 8, 10, 64.) Martin also resigned from Contiviti, and subsequently he accepted a position with DHP as a Senior Director, Eligibility Operations. (*Id.* ¶¶ 8–9.) During the two-week period between providing notice and departing Cotiviti, Defendants McDonald and Jones continued to have access to trade secrets and other sensitive information. Neither Defendant notified Cotiviti that they accepted positions with DHP. (*Id.* ¶¶ 63–64.) Cotiviti sent letters to McDonald and Jones on May 20, 2019 and to Martin on May 30, 2019 advising them that their employment at DHP violated the Non-Disclosure Agreement and RSU Agreements. (*Id.* ¶ 65.) Cotiviti also requested written assurances from McDonald and Jones that they would not work for a competitor, and that they had returned all documents and data related to Cotiviti. (*Id.* ¶ 66.) Defendants refused to terminate their employment with DHP. (*Id.* ¶¶ 68–69.)

**II.  Procedural History**

Plaintiffs filed this action on July 15, 2019, and filed the First Amended Complaint on October 15, 2019. (Docs. 1, 31.) On October 28, 2019, Defendants moved to dismiss the First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Docs. 32–33.) On November 8, 2019, Plaintiffs filed a memorandum of law with exhibits in opposition to Defendant's motion to dismiss. (Pls.' Mem.)[2] Briefing on this motion was completed when

---

[2] "Pls.' Mem." refers to the Plaintiffs' Opposition to Defendants' Motion to Dismiss the First Amended Complaint,

4

Defendants filed their reply memorandum of law on November 15, 2019. (Doc. 36.)

## III. **Legal Standard**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render [a] plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Finally, although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.* A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.

---

filed October 28, 2019. (Doc. 33.)

2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).

IV. <u>Discussion</u>

A. *Choice of Law*

1. **Breach of Contract**

Neither party disputes that Connecticut law applies to Plaintiffs' breach of contract claim, and both parties assess the breach of contract claim under Connecticut law in their submissions. Based upon the choice of law provisions in the RSU Agreement and the restrictive covenant, either Connecticut law or Georgia law plausibly apply. However, "[i]]n spite of these choice of law provisions, the parties briefed the current motion assuming that [Connecticut] law should apply. Under such circumstances, the Court of Appeals has held that it is appropriate to ignore a choice of law provision and apply the law of the forum as briefed by the parties." *Rolon v. U.S. Amada, Ltd.*, No. 95 Civ. 6231 (LAP), 1997 WL 724798, at *2 (S.D.N.Y. Nov. 18, 1997); *see Cargill, Inc. v. Charles Kowsky Res., Inc.*, 949 F.2d 51, 55 (2d Cir. 1991) (concluding that "even when the parties include a choice-of-law clause in their contract, their conduct during litigation may indicate assent to the application of another state's law"). Therefore, I can apply Connecticut law to the breach of contract claim without engaging in a choice-of-law inquiry. *See Dilek v. Watson Enters., Inc.*, 885 F. Supp. 2d 632, 641 (S.D.N.Y. 2012) (applying Connecticut law to a breach of contract claim without a choice-of-law analysis where the parties agreed Connecticut law applied).

2. **Trade Secret & Unfair Competition**

Although the parties agree that Connecticut law applies to the breach of contract claims, they disagree as to what law applies to the trade secret claims. Defendants contend that Georgia law properly applies to Plaintiffs' misappropriation of trade secrets claim, and under Georgia

law, a trade secret claim cannot be solely based on the inevitable disclosure doctrine. (Defs.' Mem. 4–5.)[3] Further, Defendants argue that even if Georgia law is inapplicable, Plaintiffs' trade secret claim still fails because they have not demonstrated that Defendants occupy similar roles at DHP as they had at Cotiviti that would require them to reply on the alleged trade secrets. (*Id.* at 5.) In opposition, Plaintiffs point to the RSU Agreements each Defendant signed, which includes a restrictive covenant as Exhibit A that contains a clause that provides that Connecticut law would apply to claims related to the contract. (Pls.' Mem. 13.) The clause states the following:

> Remedies. Participant expressly agrees and understands that the remedy at law for any breach by Participant of this Exhibit A will be inadequate and that the damages flowing from such breach are not readily susceptible to being measured in monetary terms. Accordingly, it is acknowledged that upon Participant's violation of any provision of this Exhibit A, the Company shall be entitled to immediate injunctive relief and may obtain a temporary restraining order and permanent injunction restraining any further breach. The parties hereby stipulate and agree to the exclusive jurisdiction of the federal or state courts within the State of New York for any action which may be brought under or in connection with this agreement. The failure of the Company or Participant at any time to insist upon a strict performance of any of the terms herein shall not be deemed a waiver of any subsequent breach or default in the terms, conditions and covenants herein contained. The provisions of this agreement are severable, and the enforceability or invalidity of any term or provision of this Exhibit A shall not affect the enforceability and validity of the remaining terms and provisions of this Exhibit A. If any one or more of the provisions contained in this Exhibit A shall for any reason be held to be expressly broad, as to duration, geographic scope, activity or subject matter, such provision(s) shall be construed by severing, limiting or reducing it or them so as to be enforceable to the extent compatible with the applicable law as it shall then exist. This Exhibit A shall be construed and enforced in accordance with Connecticut law.

(Doc. 31-3.)

Alternatively, Plaintiffs assert that Delaware law should apply. (Pls.' Mem. 15.) In support of this claim, Plaintiffs point to a separate choice-of-law provision in the RSU Agreements.

---

[3] "Defs.' Mem." refers to the Memorandum in Support of Motion to Dismiss Plaintiffs' First Amended Complaint filed on October 28, 2019. (Doc. 34.)

7

> 6)(k) Choice of Law; Jurisdiction. This Agreement and all claims, causes of action or proceedings (whether in contract, in tort, at law or otherwise) that may be based upon, arise out of or relate to this Agreement will be governed by the internal laws of the State of Delaware, excluding any conflicts or choice-of-law rule or principle that might otherwise refer construction or interpretation of this Agreement to the substantive law of another jurisdiction.

(Doc. 31-3.) Plaintiffs argue that Delaware law would apply to the torts claims here, as the choice-of-law provision applies to "all claims, causes of action or proceedings (whether in contract, in tort, at law or otherwise) that may be based upon, arise out of or relate to this Agreement." (*Id.*; Pls.' Mem. 15–16.) Further, Plaintiffs argue that applying Delaware law would be proper because all three Plaintiffs are incorporated in and citizens of Delaware. (*Id.* at 16.)

Defendants contend that the clause Plaintiffs cite does not state that Connecticut law will apply to any actions arising from the RSU Agreements. (Doc. 36, at 5–6.) Further, Defendants argue that even if Plaintiffs' reading of the clause is correct and Connecticut law does apply, Plaintiffs' trade secret claim does not arise from the RSU Agreements. (*Id.* at 6.) Defendants also refute Plaintiffs' claim that Delaware law may apply. First, Defendants contend that the choice-of-law clause in the RSU Agreements does not govern the trade secret claims asserted by Plaintiff, particularly where the restrictive covenants contain their own choice-of-law provision. Lastly, Defendants claim that the trade secret claim is not one that arises under the RSU Agreements. (*Id.*)

Where jurisdiction is based on diversity of citizenship, a district court must apply the choice-of-law principles of the forum state. *Fargas v. Cincinnati Mach., LLC*, 986 F. Supp. 2d 420, 423 (S.D.N.Y. 2013) ("A federal district court sitting in diversity jurisdiction must apply the choice-of-law principles of the forum state, in this case New York."); *see also Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001). As a general matter, under New York

law, "[a]bsent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000); *see also Int'l Bus. Machs. Corp. v. Mueller*, No. 14-CV-9221 (KMK), 2017 WL 4326114, at *4 (S.D.N.Y. Sept. 27, 2017) ("New York law provides that, 'as a general matter, the parties' manifested intentions to have an agreement governed by the law of a particular jurisdiction are honored. It is as though the law of the selected jurisdiction were incorporated into the agreement by reference.'") (quoting *Granite Ridge Energy, LLC v. Allianz Global Risk U.S. Ins. Co.*, 979 F. Supp. 2d 385, 391 (S.D.N.Y. 2013)). A choice-of-law provision "governs only a cause of action sounding in contract, not one sounding in tort, unless the express language of the choice-of-law provision is sufficiently broad as to encompass the entire relationship between the contracting parties." *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 425–26 (S.D.N.Y. 2006) (internal quotation marks omitted).

First, I consider Plaintiffs' claim that Connecticut law applies. While "[c]ontractual choice of law provisions are generally enforceable under both New York law and federal common law[,] . . . New York courts are 'reluctan[t] to read choice-of-law clauses broadly.'" *Arnone v. Aetna Life Ins. Co.*, 860 F.3d 97, 108 (2d Cir. 2017) (quoting *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 335 (2d Cir. 2005)). Courts within this Circuit have determined that "[w]here a choice-of-law clause specifies only that the contract will be 'governed by and construed in accordance with' the law of a certain state, New York courts hold that the clause does not control the law that applies to tort claims." *TransPerfect Glob., Inc. v. Lionbridge Techs., Inc.*, No. 19cv3283 (DLC), 2020 WL 1322872, at *7 (S.D.N.Y. Mar. 20, 2020) (quoting *Fin. One Pub. Co.*, 414 F.3d at 335); *see also Mayagüez S.A. v. Citigroup, Inc.*,

No. 16 Civ. 6788 (PGG), 2018 WL 1587597, at *8 (S.D.N.Y. Mar. 28, 2018) ("[I]n order for a choice-of-law provision to apply to claims for tort arising incident to the contract, the express language of the provision must be sufficiently broad as to encompass the entire relationship between the contracting parties." (internal quotation marks omitted)). The choice-of-law provision in Exhibit A is nearly identical to the language rejected in *Fin. One Pub. Co.* and *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996).[4] As such, the choice-of-law provision in the restrictive covenant cannot govern Plaintiffs' trademark secret claim.

Next, I consider the choice-of-law provision in the RSU Agreements. Under New York law, "when parties include a choice-of-law provision in a contract, they intend that the law of the chosen state—and no other state—will be applied." *Ministers & Missionaries Ben. Bd. v. Snow*, 26 N.Y.3d 466, 476 (N.Y. 2015). The court in *Ministers* also stated that "New York courts should not engage in any conflicts analysis where the parties include a choice-of-law provision in their contract." *Id.* at 475; *see Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-cv-4819 (GBD), 2018 WL 6786338, at *20–21 (S.D.N.Y. Oct. 25, 2018), *aff'd and remanded in part*, 796 F. App'x 55 (2d Cir. 2020). The RSU Agreements reference the restrictive covenant attached to the agreement as Exhibit A as consideration for the restrictive stock units: "In consideration of the Restricted Stock Units granted herein, to the extent the Participant is not a party to any employment agreement with the Company or any of its subsidiaries with similar restrictive covenants, the Participant agrees to be bound by the provisions set forth on Exhibit A attached hereto." (Doc. 31-3.) Exhibit A must be read in conjunction with the RSU Agreement, as

---

[4] The contractual language at issue in *Fin. One Pub. Co.* states, "[t]his Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)." 414 F.3d at 332. The contractual language at issue in *Krock v. Lipsay* states, "[t]his Mortgage shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts." 97 F.3d at 645. The language at issue in these cases and the language at the provision at issue here are substantially similar on their face.

Paragraph 5 of the Agreement explicitly states the party agrees to be bound by the restrictive covenant. *See, e.g.*, *Comm Trade USA, Inc. v. INTL FCStone, Inc.*, No. 13 Civ. 3998 KBF, 2014 WL 787912, at *5 (S.D.N.Y. Feb. 27, 2014). As such, the RSU Agreement's choice-of-law provision—which expressly encompasses tort claims—governs Plaintiffs' misappropriation of trade secrets claims. In keeping with the analysis, I conclude that Delaware law also applies to Plaintiff's unfair competition claims.

I note that per the language of the RSU Agreement's restrictive covenant Delaware law could also plausibly apply to the breach of contract claims to which I concluded and applied Connecticut law above. In making the determination to apply Connecticut law to breach of contract claims and Delaware law to the remaining claims, I rely on a bedrock principle of contract interpretation: "In a situation of potential contract ambiguity, an interpretation that gives a reasonable and effective meaning to all terms of a contract is preferable to one that leaves a portion of the writing useless or inexplicable." *Hartford Fire Ins. Co.*, 230 F.3d at 558. As such, I conclude that the most reasonable interpretation of the two conflict-of-law provisions at issue here is that the provision in the restrictive covenant applies to any breach of the covenant, while the provision in the RSU agreement applies to claims that fall outside of the scope of provision in the restrictive covenant, i.e., tort claims.

        **B.**     *Breach of Contract Claim*

The elements of a breach of contract claim under Connecticut law are: "the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." *Rosato v. Mascardo*, 844 A.2d 893, 902 (Conn. App. Ct. 2004) (quoting *Bouchard v. Sundberg*, 834 A.2d 744, 751 (Conn. App. Ct. 2003)).

Plaintiffs' pleadings adequately demonstrate that the parties formed an agreement when they entered into the RSU Agreements; a fact Defendants do not dispute, (Defs.' Mem. 2). The

parties disagree, however, over whether Defendants breached the restrictive covenants in the RSU Agreements and the Non-Disclosure Agreements. Specifically, Defendants argue that Plaintiffs fail to demonstrate that Defendants are providing substantially similar services to their current employer, DHP. (*Id*. at 3.) As detailed below, with regard to Defendant McDonald, this argument is fatally flawed, and there is information of which I can take judicial notice with regard to Jones and Martin that support Plaintiffs' assertion that Defendants are providing substantially similar services to DHP.

"When reviewing a 12(b)(6) dismissal, the court accepts as true all factual allegations in the complaint." *Dorsett v. Cty. of Nassau*, 732 F.3d 157, 159 (2d Cir. 2013). The non-compete provision Plaintiffs allege Defendants breached—included in the RSU Agreements as Exhibit A—restricts Defendants from "directly or indirectly provid[ing] substantially similar professional services within the Territory to that part of any Person engaged in selling or providing Competitive Services" for a period of two years. (Doc. 31-3.) Plaintiffs assert in the First Amended Complaint that DHP is a direct competitor that engages in coordination of benefits ("COB") services similar to Plaintiffs. (FAC ¶ 31.) Plaintiffs also alleges that McDonald—as Vice President, Client Engagement of Cotiviti—was responsible for building client relationships and managing the company's relationship with one of Plaintiffs' largest clients to provide COB services. (*Id.* ¶¶ 33–34.) Plaintiffs also state that McDonald joined DHP as Vice President of Eligibility Operations, and that in this role McDonald oversees DHP's COB related business. (*Id*. ¶ 7.) Martin was employed at Cotiviti as a Senior Director of Audit Operations; in this role, Martin oversaw multiple accounts and audit projects. (*Id*. ¶ 37.) Martin is now employed at DHP as a Senior Director, Eligibility Operations. (*Id*. ¶ 9.) DHP currently lists Martin's title as Vice President, Payment Integrity Operations. In this capacity, Martin

"leads Discovery's Premium Restoration and Coordination of Benefits Operations teams and drives results that help customers improve claims and eligibility accuracy." *Jeff Martin*, Discovery Health Partners (last visited July 1, 2021), https://www.discoveryhealthpartners.com/about-us/jeff-martin/. Jones was Director, Operations – Data Mining, Analytics and Payment Accuracy at Cotiviti. In this role, Jones managed Cotiviti accounts, oversaw the development of new audit concepts, client contract management, audit staffing and delivery, and account growth. (FAC ¶ 41.) Jones joined DHP as a Senior Director, Coordination of Benefits. (*Id.* ¶ 10.) In this role, Jones is "responsible for directing Discovery's Coordination of Benefits (COB) organization while driving growth, new solutions, and process improvements to deliver best-in-class results for [its] clients." *Ron Jones*, Discovery Health Partners (last visited July 1, 2021), https://www.discoveryhealthpartners.com/author/ron-jones/. On his LinkedIn profile, Jones states that his responsibilities at DHP include: "P&L [], strategic planning, client management, technology/automation build out, content creation, and yield management." *Ron Jones*, LinkedIn (last visited July 1, 2021), https://www.linkedin.com/in/ron-jones-936b2955.

Although Plaintiffs did not provide any details as to what responsibilities Jones and Martin have in their new positions, I take judicial notice of information provided on DHP's website, as it is publicly available, and its authenticity is not in dispute. At the motion to dismiss phase, "[t]he court may consider the complaint, documents attached to the complaint or incorporated by reference, or matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Mehmet v. Gautier*, No. 18-CV-9090 (VSB), 2019 WL 4805859, at *5 (S.D.N.Y. Sept. 30, 2019). Pursuant to Fed. R. Evid. 201(1), "[I] . . . may take judicial notice on [my] own" of "a fact that is not subject to reasonable dispute." Fed. R. Evid. 201(b), (c). "[T]he

13

case law applying Rule 201 states that, '[f]or purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination.'" *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015) (quoting *Doron Precision Sys. v. FAAC, Inc.*, 423 F. Supp. 2d 173,179 n.8 (S.D.N.Y. 2006)). "If a court does take judicial notice of a website, the website's purposes at the motion-to-dismiss stage are limited in that it can be used only for determining what the documents state and not to prove the truth of their contents." *Casio v. Vineyard Vines, LLC*, No. 19-CV-5135 (JMA) (AYS), 2021 WL 466039, at *5 (E.D.N.Y. Feb. 9, 2021) (internal quotation marks omitted). In support of their breach of contract claim against McDonald, Plaintiffs referenced DHP's March 6, 2019 press release, which is found on the same website as the biographies for Jones and Martin. (Pls.' Opp. 6); *Discovery Welcomes Kevin McDonald as New Vice President of Eligibility Operations*, Discovery Health Partners (last visited June 29, 2021), https://www.discoveryhealthpartners.com/discovery-welcomes-kevin-mcdonald-new-vice-president-eligibility-operations/. Defendants did not contest the authenticity of the press release. As such, I take judicial notice of the information provided on DHP's website describing Jones's and Martin's job responsibilities.

Plaintiffs have alleged sufficient facts to support a claim of breach of contract against McDonald, Martin and Jones given the scope of the non-compete provision and the details of the former employees' responsibilities in their roles at DHP. When coupled with the allegation that DHP is a direct competitor of Plaintiff, the pleading provides "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" that Defendants provide substantially similar services to DHP in their new roles. *Twombly*, 550 U.S. at 556; *see, e.g.*, *S. Home Care*

*Servs., Inc. v. Visiting Nurse Servs., Inc. of S. Conn.*, No. 3:13CV792 (RNC), 2014 WL 12756150, at *3 (D. Conn. Mar. 13, 2014) (concluding that Plaintiff's breach of contract claim survived Defendants' motion to dismiss where former employees worked for another employer in the same industry).

### C. *Trade Secret Claim*

To adequately plead a claim of misappropriation of trade secrets under Delaware law, Plaintiffs must show

> acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means or, alternatively, the disclosure or use of a trade secret of another without express or implied consent by a person who either: (1) acquired the secret by improper means; (2) knew or had reason to know that their knowledge of the trade secret was (A) derived by another who acquired it by improper means, (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or (C) acquired by accident or mistake.

*Adtile Techs. Inc. v. Perion Network Ltd.*, Civ. No. 15-1193-SLR, 2016 WL 3457152, at *3 (D. Del. June 23, 2016) (internal quotation marks omitted) (citing Del. Code Ann. tit. 6, § 2001 (West)). Further, Delaware courts have enjoined Defendants from working at a competitor where there is "an inevitable and imminent danger of disclosure of . . . trade secrets to [competitor] and use of these trade secrets by [competitor]." *W.L. Gore & Assocs., Inc. v. Wu*, No. Civ.A. 263-N, 2006 WL 2692584, at *17 (Del. Ch. Sept. 15, 2006), *aff'd*, 918 A.2d 1171 (Del. 2007) (internal quotation marks omitted).

Plaintiffs argue that they have adequately pled misappropriation of trade secrets, as Defendants will inevitably disclose trade secrets because they had access to trade secrets while employed at Cotiviti and have similar responsibilities in their new roles at DHP. (Pls.' Mem. 21–22.) Defendants disagree; they claim that Plaintiffs have failed to demonstrate that Defendants occupy roles similar to the ones they had at Cotiviti. (Doc. 36, at 8.) As I concluded

15

above, Plaintiffs adequately alleged that Defendants' roles at DHP is similar to their roles at Cotiviti. Because Plaintiffs have demonstrated that Defendants had access to Cotiviti's trade secrets during their employment and that they have substantially similar responsibilities in their new roles, they have sufficiently alleged misappropriation of trade secrets as to all Defendants.

### D. *Unfair Competition Claim*

Under Delaware law, the "elements of the tort of unfair competition are that the plaintiff has a reasonable expectancy of entering a valid business relationship, with which the defendant wrongfully interferes, and thereby defeats the plaintiff's legitimate expectancy and causes him harm." *Ethypharm S.A. France v. Abbott Labs.*, 598 F. Supp. 2d 611, 618 (D. Del. 2009) (quoting *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1057 (Del. Super. Ct. 2001)). While "Delaware courts have struggled to precisely define the boundaries of the common law in this area," they have concluded that "[t]he essential element separating unfair competition from legitimate market participation . . . is an unfair action on the part of defendant by which he prevents plaintiff from legitimately earning revenue." *EDIX Media Grp., Inc. v. Mahani*, No. Civ.A. 2186-N, 2006 WL 3742595, at *11 (Del. Ch. Dec. 12, 2006).

Defendants contend that Plaintiffs' unfair competition claim is duplicative of their other claims and, as such, fails for the same reasons Defendants argue Plaintiffs' breach of contract and misappropriation of trademark claims fail. (Defs.' Mem. 9.) Plaintiffs do not dispute Defendants' assertion that their unfair competition claim relies on their breach of contract and misappropriation of trade secret claims. Instead, Plaintiffs counter by relying on the amorphous nature of the tort. Plaintiffs claim the First Amended Complaint demonstrates that Defendants have or will misappropriate trade secrets to gain an unfair advantage. As a result, Plaintiffs conclude that they face the prospect of loss of business expectancies, and other monetary and non-monetary damages. (Pls.' Mem. 25.) I conclude that Plaintiffs have failed to allege a claim for

unfair competition. Delaware courts have found unfair competition claims "redundant" where the claim neither "affords plaintiff[s] [] relief at common law from breaches of confidentiality that [their] claim in contract does not [] [n]or expand[s] upon damages derived from [a] non-competition agreement." *EDIX Media*, 2006 WL 3742595, at *11. An unfair competition claim also fails when another claim the unfair competition claim is derived from is insufficiently pled. *See Accenture Glob. Servs. GMBH v. Guidewire Software Inc.*, 581 F. Supp. 2d 654, 666 (D. Del. 2008). Plaintiffs fail on both counts. Plaintiffs' unfair competition claim neither affords relief that their breach of contract and trade secret claims do not, nor does it provide additional damages.

## V. Conclusion

For the foregoing reasons, Defendants' motion to dismiss, (Doc. 33), Plaintiffs' First Amended Complaint is GRANTED in part and DENIED in part. Specifically, the motion is granted as to Plaintiffs' unfair competition claim, and denied as to Plaintiffs' breach of contract and misappropriation of trade secrets claims. The Clerk of Court is respectfully directed to terminate the open motion at Doc. No. 33. Defendants shall file an Answer to the First Amended Complaint within twenty-one days of the date of this Opinion & Order.

SO ORDERED.

Dated: July 2, 2021
      New York, New York

                                                        Vernon S. Broderick
                                                      United States District Judge